# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-01839-STV

L.N.,[1]

     Plaintiff,

v.

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

     Defendant.

_____

## ORDER
_____

Chief Magistrate Judge Scott T. Varholak

     This matter is before the Court on Plaintiff L.N.'s Complaint seeking review of the Commissioner of Social Security's decision denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 401 *et seq*., and 1381-83c, respectively. [#1] The parties have both consented to proceed before this Court for all proceedings, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and D.C.COLO.LCivR 72.2. [#7] The Court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This Court has carefully considered the Complaint [#1], the Social Security Administrative Record [#10], the parties' briefing [## 11, 12, 18], and the applicable case law, and has determined that oral

---

[1] Pursuant to D.C.COLO.LAPR 5.2(b), "[a]n order resolving a social security appeal on the merits shall identify the plaintiff by initials only."

argument would not materially assist in the disposition of this appeal.  For the following reasons, the Court **REVERSES** the Commissioner's decision and **REMANDS** this matter for further proceedings consistent with this Order.

## I.    LEGAL STANDARD

### A.    Five-Step Process for Determining Disability

The Social Security Act defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[2]   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "This twelve-month duration requirement applies to the claimant's inability to engage in any substantial gainful activity, and not just his underlying impairment." *Lax*, 489 F.3d at 1084.   "In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility . . ., the Commissioner [ ] shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."   42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

"The Commissioner is required to follow a five-step sequential evaluation process to determine whether a claimant is disabled."  *Hackett v. Barnhart*, 395 F.3d 1168, 1171 (10th Cir. 2005).  The five-step inquiry is as follows:

---

[2] "Substantial gainful activity" is defined in the regulations as "work that (a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit." 20 C.F.R. §§ 404.1510, 416.910; *see also* 20 C.F.R. §§ 404.1572, 416.972.

1. The Commissioner first determines whether the claimant's work activity, if any, constitutes substantial gainful activity;

2. If not, the Commissioner then considers the medical severity of the claimant's mental and physical impairments to determine whether any impairment or combination of impairments is "severe;"[3]

3. If so, the Commissioner then must consider whether any of the severe impairment(s) meet or exceed a listed impairment in the appendix of the regulations;

4. If not, the Commissioner next must determine whether the claimant's residual functional capacity ("RFC")—*i.e.*, the functional capacity the claimant retains despite his impairments—is sufficient to allow the claimant to perform his past relevant work, if any;

5. If not, the Commissioner finally must determine whether the claimant's RFC, age, education and work experience are sufficient to permit the claimant to perform other work in the national economy.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005); *Bailey v. Berryhill*, 250 F. Supp. 3d 782, 784 (D. Colo. 2017). "The claimant bears the burden of establishing a *prima facie* case of disability at steps one through four," after which the burden shifts to the Commissioner at step five to show that the claimant retains the ability to perform work in the national economy. *Wells v. Colvin*, 727 F.3d 1061, 1064 n.1 (10th Cir. 2013); *Lax*, 489 F.3d at 1084. "A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis." *Ryan v. Colvin*, 214 F. Supp. 3d 1015, 1018 (D. Colo. 2016) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991)).

---

[3] The regulations define severe impairment as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c).

**B.    Standard of Review**

In reviewing the Commissioner's decision, the Court's review is limited to a determination of "whether the Commissioner applied the correct legal standards and whether her factual findings are supported by substantial evidence."  *Vallejo v. Berryhill*, 849 F.3d 951, 954 (10th Cir. 2017) (citing *Nguyen v. Shalala*, 43 F.3d 1400, 1402 (10th Cir. 1994)).    "With regard to the law, reversal may be appropriate when [the Commissioner] either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards."  *Bailey*, 250 F. Supp. 3d at 785 (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)).

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations."  *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (quotation omitted).  "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high."  *Id.*  at 103.  Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (quotation omitted).  "It requires more than a scintilla, but less than a preponderance."  *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax*, 489 F.3d at 1084).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Grogan*, 399 F.3d at 1261-62 (quoting *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992)).  The Court must "meticulously examine the record as a whole, including anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met.'" *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (quotation omitted).  The Court,

however, "will not reweigh the evidence or substitute [its] judgment for the Commissioner's." *Hackett*, 395 F.3d at 1172.

## II.    BACKGROUND

Plaintiff was born in 1971.  [AR 234][4]  Plaintiff speaks and understands English. [AR 258]  She dropped out of high school in the tenth grade but obtained a GED.  [AR 260, 592]  On August 26, 2021, Plaintiff submitted a claim for DIB [AR 234-38] and on December 27, 2021, she applied for SSI [AR 239-45].  In each filing she claimed a disability onset date of January 1, 2018 [AR 234, 239], and thus Plaintiff was 46 years old at the time of the alleged onset.  Plaintiff claims disability based upon back pain, rheumatoid arthritis, a back injury, a neck injury, migraines, depression, and anxiety.  [AR 259]  Plaintiff has worked as a cook, caregiver, and cashier.  [AR 260, 269-74, 322]

### A.    Medical Background

Plaintiff suffers from a variety of physical conditions including morbid obesity; migraines; hypothyroidism; GERD; shortness of breath; chronic pain including neck, back and knee pain; bilateral neuropathy; and spinal stenosis.  [AR 343, 390, 401]  Plaintiff also suffers from anxiety and depression.  [AR 390]

In 2017, Plaintiff was in a rollover accident and injured her spine.[5]  [AR 592, 684] Two years later, on March 6, 2019, Plaintiff was a restrained backseat passenger in a vehicle that T-boned another car while travelling approximately twenty miles per hour. [AR 373, 376]  Plaintiff thought that she may have hit her head but she did not lose

---

[4] All references to "AR" refer to the sequentially numbered Social Security Administrative Record filed in this case.  [#10]

[5] The administrative record does not contain any medical reports from this accident though Plaintiff described it on at least two occasions.  [AR 592, 684]  Plaintiff described it as a rollover accident which appears distinct from the subsequent T-bone accident described herein.

consciousness and denied having headaches, vomiting or neck pains.  [AR 373]  Plaintiff did complain that the accident had aggravated her preexisting lower back pain.  [*Id.*] Plaintiff described the pain as a tightening across her lower lumbar spine.  [*Id.*]  A physical examination noted mild tenderness of the lumbar spine at L1 and L5-S1.  [AR 375, 377] An x-ray of the lumbar spine revealed an age-indeterminate L1 compression fracture not suspected of being attributable to the accident.  [AR 377, 380]  Plaintiff also complained about right knee pain, worse on extension, and thought that she may have hit her knee on the seat in front of her.  [AR 373]  The right knee was tender upon examination.  [AR 375]  An x-ray of the knee was negative.  [AR 377, 379]

On September 5, 2019, Plaintiff attended a preoperative evaluation for a C5-C6 anterior cervical discectomy and fusion ("ACDF").  [AR 354]  Medical notes indicate that Plaintiff had been experiencing continued pain and decreased range of motion from C-spine stenosis and that conservative treatment had not worked.  [AR 343, 354]   Plaintiff indicated that her pain was eight out of ten when it was at its worst.  [AR 354]  Plaintiff further indicated that the pain would radiate down both legs and arms with some loss of control in her fingers.  [*Id.*]

On September 9, 2019, Plaintiff underwent the ACDF.  [AR 343]   Plaintiff tolerated the procedure well and there were no complications.   [AR 348-49]  Following the operation, Plaintiff described her pain as constant, rating seven of ten, and worse with movement.  [AR 343]

A November 27, 2019 CT scan of the cervical spine indicated that the C5-C6 ACDF hardware remained intact and well seated.  [AR 371]  It further revealed mild cervical spondylotic changes but no acute fracture or listhesis of the cervical spine.  [*Id.*]  Finally,

it showed posterior disc osteophyte complex at C5-C6 resulting in mild spinal and mild foraminal narrowing. [*Id.*] A March 2, 2020 x-ray of the thoracic and lumbar spine revealed chronic mild superior endplate compression deformity of L1, mild thoracolumbar spondylosis, and minor S-shaped scoliosis. [AR 363] The thoracic and lumbar vertebra were otherwise preserved in height and alignment without acute fracture or listhesis identified. [*Id.*]

During a May 21, 2020 medical visit Plaintiff described her neck pain as 6 out of ten. [AR 396] Records from a June 18, 2020 medical visit reflect continued neck and back pain, especially severe in the low-mid back area. [AR 400] A physical examination of the back and spine did not reveal any tenderness. [AR 402] Plaintiff was seeking pain management but that was on hold due to the COVID-19 pandemic. [AR 400]

Records from August 6, 2020 indicate that Plaintiff was still having back pain though the back pain was doing better with exercise. [AR 413, 416, 418] Plaintiff was also having neck pain which she rated at one visit as a six out of ten. [*Id.*] She similarly reported her neck pain as six out of ten at subsequent visits in 2020. [AR 421, 426, 431] And records from November 2020 reflect Plaintiff continuing to have back pain but again indicate that it was improved with exercise. [AR 434]

On December 17, 2020, Plaintiff reported to her medical provider that her back pain was interfering with her sleep and cortisone shots were discussed. [AR 435] Records throughout 2021 and 2022 reflect continued back and neck pain. [*See, e.g.*, AR 481, 486, 493, 511, 519, 620] On August 2, 2022, Plaintiff described her back pain as typically a five out of ten. [AR 592] During an August 6, 2022 consultative examination Plaintiff described her back pain as seven or eight out of ten. [AR 602] An x-ray from

that date revealed chronic L1 endplate deformity and mild thoracolumbar spondylosis and S shaped scoliosis.  [AR 600, 602]

Plaintiff's back pain caused her to visit the emergency room on January 4, 2023. [AR 698]  And during a February 18, 2023 consultative examination Plaintiff described her neck pain as dull, aching and throbbing, with a pain scale of five out of ten.  [AR 686] During that same examination she described her lower back pain as intermittent, throbbing and sharp with a pain scale of six out of ten that can rise to a seven or eight out of ten.  [*Id.*]

On May 15, 2023, Plaintiff had an MRI of the lumbar spine.  [AR 724]  The MRI revealed degenerative disc disease and chronic compression fracture of the L1 vertebral body as well as a slight grade 1 anterolisthesis at the T12 and L1.  [*Id.*]  There was no evidence of cord or nerve root compression.  [*Id.*]

In addition to neck and back pain, Plaintiff also suffers from knee pain.  Plaintiff suffered a right meniscus tear in 2010.  [AR 394]  As indicated above, Plaintiff believed she may have hit her right knee on the seat in front of her during her March 6, 2019 automobile accident.  [AR 373]  She complained about right knee pain, worse on extension, and the right knee was tender upon examination.  [AR 373, 375]  An x-ray of the knee was negative.  [AR 377, 379]  Records from June 2020 reflect continued knee pain that was aggravated by colder weather.  [AR 400-01]  Records from August and October 2020 likewise reflect continued knee pain.  [AR 410, 415, 425]

A February 4, 2022 medical record indicates that Plaintiff's knee pain had worsened.  [AR 505]  During an April 12, 2022 medical visit Plaintiff indicated that her knee was "more painful today."  [AR 527]  The provider planned to increase Plaintiff's

gabapentin dosage.  [*Id.*]  Notes from a May 9, 2022 medical visit indicate that Plaintiff's right knee pain was persistent and that the provider intended to order a knee brace for Plaintiff to use while walking.  [AR 529, 535]  Knee pain was also reflected in a June 7, 2022 medical record.  [AR 616] And as of August 2, 2022, Plaintiff was still experiencing knee pain which she described as typically a five out of ten.  [AR 592] During an August 6, 2022 consultative examination Plaintiff described her knee pain as ranking seven or eight out of ten.  [AR 602-03]  An x-ray of the right knee from that day was unremarkable. [AR 600]  During a February 18, 2023 consultative examination Plaintiff rated her knee pain as seven out ten and described it as mostly throbbing but stabbing on occasion.  [AR 686]

Plaintiff also suffers from headaches.  A September 9, 2019 medical record described Plaintiff's headaches as well-controlled with medication.  [AR 343]  On December 17, 2020, however, Plaintiff reported having migraines on a daily basis.  [AR 435]  During a January 15, 2021 visit Plaintiff indicated that Aimovig had "drastically improved" her migraines [AR 440], but one month later Plaintiff again described having bad migraines for the past two weeks [AR 446].

In May 2021 Plaintiff reported that her migraines "come and go" and were worse with the cold.  [AR 464]  She reported still having migraines during an August 12, 2021 appointment.  [AR 476]  According to Plaintiff, she was having several migraines per month.  [AR 481]  Plaintiff indicated that the medications were no longer working.  [*Id.*]

Notes from a May 2022 medical appointment reflect Plaintiff continuing to experience migraines [AR 535] though records from June 7, 2022 describe the migraines as "gone with topiramate" [AR 616].  An August 1, 2022 brain MRI revealed normal signal

intensity and no evidence of acute ischemia or acute infarction.  [AR 673]  There was a high T2 signal in the right greater than left mastoid air cells reflecting mastoid inflammatory change.  [*Id.*]

During an August 6, 2022 consultative examination Plaintiff described the migraines as radiating from the base of the occiput to the eyebrows.  [AR 603]  Plaintiff also expressed some sensitivity to light.  [*Id.*]  Plaintiff was again taking Aimovig which she said helped decrease the intensity of the headaches but not the frequency.  [*Id.*]  During a November 7, 2022 medical appointment Plaintiff described the migraines as "constant" and making her sick.  [AR 651, 658]  She expressed sensitivity to light and said she was sleeping in a dark room.  [AR 651]  Medical records from February and April 2023 continue to reflect migraines which Plaintiff described as "terrible."  [AR 708, 714]

In addition to the specific physical problems described above, there is some indication in the administrative record that Plaintiff may suffer from an overall chronic pain. For example, on September 9, 2019, Plaintiff's chronic pain was described as well-controlled with medication.  [AR 343]  Similarly, records from November 2020 indicate that Plaintiff's "bones ache with cold."  [AR 430]  During a January 17, 2023 examination Plaintiff reported her chronic pain as a seven or eight out of ten.  [AR 677]

In addition to these physical impairments, Plaintiff also suffers from some mental health issues.  Records from February 25, 2020 reflect Plaintiff suffering from anxiety and depression.  [AR 390]  At the time, Plaintiff refused therapy or medication.  [*Id.*]  Plaintiff reported worsening anxiety and depression on March 20, 2020 but again refused therapy or treatment.  [AR 392]  Records from a February 2021 appointment note elevated anxiety though Plaintiff again refused medication or therapy.  [AR 446, 448]  Records from August

2021 indicate that Plaintiff's depression was increased and that Plaintiff was teary during the appointment.  [AR 481]  During a January 17, 2023 examination Plaintiff described ongoing depression and isolation with some crying spells.  [AR 677]  And during a June 29, 2023 medical appointment Plaintiff said that she was struggling with anxiety which was impacting her ability to sleep.  [AR 720]

On August 11, 2023, Plaintiff had an initial treatment assessment for some of the mental health issues with which she had been struggling.  [AR 738, 747]  She self-reported anxiety, depression, and PTSD.  [AR 738-40]  Her affect was sad and her mood was depressed and anxious.  [AR 746]  The plan was for Plaintiff to attend weekly therapy for the next six months.  [AR 749]  Continued assessment sessions occurred on August 22, September 5, and September 12.  [AR 751-60]  The administrative record does not contain additional therapy notes beyond these initial consultation sessions.

**B.    Opinion Evidence**

On August 2, 2022, Plaintiff underwent a mental status examination with David Benson, Ph.D.  [AR 591-96]  Plaintiff reported that her psychological problems began in 2013 "when she had a major medical crisis, the nature of which is unclear."  [AR 591]  Plaintiff reported a childhood history of physical and sexual abuse.  [AR 592]  Plaintiff's thought process was organized and coherent.  [AR 594]  Her long-term memory was intact though she had trouble with attention and concentration.  [*Id.*]  She had delayed memory recall and appeared to struggle with basic math.  [*Id.*]  Dr. Benson diagnosed her with post-traumatic stress disorder ("PTSD"), unspecified anxiety disorder, and rule-out unspecified depressive disorder.  [AR 595]  He concluded that Plaintiff had mild impairment in her ability to interact appropriately with supervisors and peers.  [*Id.*]  He opined that Plaintiff had mild to moderate impairment in her ability to interact appropriately

with the public and to respond appropriately to usual work situations and to changes in routine work settings.  [*Id.*]  He concluded that Plaintiff was moderately impaired in her ability to: (1) understand and remember simple instructions, (2) carry out simple instructions, and (3) make judgments on simple work-related decisions.  [*Id.*]   Finally, he opined that Plaintiff had moderate to marked impairment in her ability to: (1) understand and remember complex instructions, (2) carry out complex instructions, and (3) make judgments on complex work-related decisions.  [*Id.*]

On August 11, 2022, state consultative examiner Cathy A. Word-Allen, Ph.D. issued a mental RFC opinion.  [AR 75, 79-80]  Dr. Word-Allen found that Plaintiff had mild limitations in her ability to interact with others and to adapt or manage herself.  [AR 75]  She concluded that Plaintiff had moderate limitations in her ability to: (1) understand, remember, or apply information; (2) concentrate, persist, or maintain pace; (3) carry out detailed instructions; (4) maintain attention and concentration for extended periods;  (5) work in coordination or in proximity to others without distraction; and (6) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of rest periods.   [AR 75, 79]   Dr. Word-Allen concluded that Plaintiff could follow simple instructions; sustain ordinary routines and make simple work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting.  [AR 80]

On August 6, 2022, Plaintiff underwent an Independent Medical Examination with Kristina Barber, M.D.  [AR 602-08]  On examination Plaintiff's gait was slow but normal.  [AR 605]  Plaintiff experienced dorsolumbar pain with flexion to the right and right knee

pain.  [AR 605-06]  Dr. Barber diagnosed Plaintiff with: (1) chronic right knee pain status post-meniscal repair with MCL laxity on exam reflecting medial compartment OA and MCL tear; (2) chronic axial low back pain secondary to mild thoracolumbar spondylosis and radiographic scoliosis; (3) intermittent, mild neck pain secondary to mild at level spondylosis with history of C5-6 ACDF; (4) chronic migraine-type headaches; (5) depression – deferred; and (6) anxiety – deferred.  [AR 607]  Dr. Benson opined that Plaintiff could: (1) sit and stand for 4-6 hours during a normal workday; (2) walk for about 6-8 hours during a normal workday; (3) lift and carry 0-20 pounds frequently and 20-50 pounds occasionally; and (4) frequently bend, stoop, squat, crouch, and/or crawl.  [*Id.*] Dr. Benson did not recommend any other restrictions.  [*Id.*]

On August 17, 2022, state consultative examiner Erin Madden, M.D. issued a physical RFC opinion.  [AR 77-79]  Dr. Madden opined that Plaintiff could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds.  [AR 77]  Dr. Madden concluded that Plaintiff could stand, walk and sit about six hours in an eight hour workday.  [*Id.*]  Dr. Madden opined that Plaintiff could frequently climb ramps and stairs, balance, and stoop, and occasionally kneel, crouch, and crawl.  [AR 78]  Dr. Madden further opined that Plaintiff needed to avoid concentrated exposure to extreme temperatures and needed to avoid even moderate exposure to hazards such as machinery and heights.  [*Id.*]  On March 2, 2023, state consultative examiner Aaron Snyder, M.D., issued an identical physical RFC opinion.  [AR 100-02]

On January 17, 2023, Plaintiff underwent a psychiatric consultation examination with Dr. Madsen.  [AR 677-80]  Plaintiff was oriented to person, place and time.  [AR 678] Her affect was consistent with an anxious and depressed mood.  [*Id.*]  Her thought

processes and content were logical and relevant. [*Id.*] Testing indicated that Plaintiff's short-term auditory memory was slightly impaired and her ability to do arithmetic functions was impaired. [*Id.*] Dr. Madsen diagnosed Plaintiff with persistent depressive disorder, PTSD or generalized anxiety panic and agoraphobia, and cognitive disorder not otherwise specified. [AR 679] Dr. Madsen concluded that Plaintiff would be mildly impaired in her ability to: (1) perform simple repetitive tasks; (2) accept instructions from supervisors; and (3) interact with coworkers and with the public. [AR 679-80] Dr. Madsen opined that Plaintiff would be moderately impaired in her ability to: (1) perform detailed and complex tasks on a consistent basis over an extended period; (2) maintain acceptable attendance in the workplace; (3) perform work activities on a consistent basis; (4) complete a normal workday or workweek without interruptions resulting from her psychiatric conditions; and (5) deal with the usual stress encountered in a competitive work environment. [*Id.*] Dr. Madsen also opined that Plaintiff would require specialized supervision from individuals trained to supervise those who have chronic mental health issues related to chronic pain. [AR 679]

On January 31, 2023, state consultative examiner Mark Suyeishi, Psy.D. conducted a consultative examination. [AR 97-98] Plaintiff reported that she was not depressed though she appeared anxious, distracted and preoccupied. [AR 97] Dr. Suyeishi estimated Plaintiff's intelligence to be in the average to low-average range. [*Id.*] He concluded that Plaintiff did not have any medically determinable mental impairments. [*Id.*]

On February 8, 2023, Plaintiff underwent an evaluation by A. Severance, D.O. [AR 684-89] At the time of the evaluation, Plaintiff was homeless. [AR 685] Dr. Severance

did a physical examination and diagnosed Plaintiff with morbid obesity, untreated rheumatoid arthritis, chronic migraines/headaches, hypothyroidism, history of substance use, lumbago, dorsalgia, cervicalgia, arthralgia of the right knee, bilateral tinnitus, and homelessness.  [686-88]  Dr. Severance opined that Plaintiff could stand and walk for four hours in an eight-hour workday, with no restrictions on sitting.  [AR 688]  Dr. Severance further opined that Plaintiff could lift, carry, push and pull 25 pounds occasionally and 10 pounds frequently.  [*Id.*]  Dr. Severance concluded that Plaintiff could climb steps and stairs occasionally, but never climb ladders, scaffolds, or ropes.  [*Id.*]  Finally, Dr. Severance opined that Plaintiff could balance frequently and stoop occasionally, but never crouch, crawl, or kneel.  [*Id.*]

### C.     Procedural History

Plaintiff's applications for DIB and SSI were initially denied on August 18, 2022.  [AR 71, 82]  Plaintiff requested reconsideration and on March 2, 2023, Plaintiff's applications were again denied.  [AR 93, 105]  On March 21, 2023, Plaintiff completed a request for a hearing before an Administrative Law Judge ("ALJ").  [AR 160-61]  A hearing was conducted before ALJ Kathryn D. Burgchardt on September 26, 2023.  [AR 42-70]  Plaintiff was represented at the hearing by attorney Cord Harris.  [AR 42]  Plaintiff and Vocational Expert ("VE") Ashley Bryars both testified at the hearing.  [AR 43-70]

On November 17, 2023, the ALJ issued a decision that Plaintiff had not been under a disability from the alleged onset date through the date of the ALJ's opinion.  [AR 17-35]  Plaintiff requested a review of that decision by the Appeals Council and, on April 30, 2024, the Appeals Council denied Plaintiff's request for review.  [AR 1-6]  On July 1, 2024, Plaintiff timely filed her appeal with this Court.  [#1]

15

**D.    The ALJ's Decision**

After evaluating the evidence pursuant to the five-step sequential evaluation process, the ALJ denied Plaintiff's applications for DIB and SSI.  [AR 17-35]  At step one, the ALJ determined that Plaintiff had engaged in substantial gainful activity from April through August 2018 but that there had been a continuous twelve-month period during which she did not engage in substantial gainful activity.  [AR 20]  At step two, the ALJ found the following medically determinable severe impairments: degenerative disc disease of the cervical and lumbar spine and scoliosis; right knee pain status post-meniscectomy; obesity; migraines; depression; anxiety; and PTSD.  [AR 20-21]  At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the appendix of the regulations.  [AR 21-25]

Following step three, the ALJ determined that Plaintiff retained the RFC to perform light work[6] but with the following limitations:

> [Plaintiff] can sustain ordinary routines and make simple work-related decisions.  [Plaintiff] can respond appropriately to supervision, coworkers, and work situations, and can deal with changes in a routine work setting.  [Plaintiff] could only lift or carry up to 10 pounds frequently and 20 pounds occasionally.  [Plaintiff] could stand or walk with normal breaks for a total of 6 hours in an 8-hour workday and could sit with normal breaks for a total of 6 hours in an 8-hour workday.  [Plaintiff] could perform pushing and pulling motions with upper and lower extremities within the weight restrictions given.  [Plaintiff] should avoid unprotected heights and moving machinery.  [Plaintiff] could perform the following postural activities occasionally: crouching, kneeling, and crawling.  [Plaintiff] should not climb any ladders, ropes, or scaffolds on the job.  [Plaintiff] could frequently perform climbing of ramps or stairs, frequently balance, and frequently stoop.  [Plaintiff]

---

[6] Light work is defined to include work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and that "requires a good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. §§ 404.1567(b), 416.967(b).

should avoid concentrated exposure to extreme cold and avoid concentrated exposure to extreme heat.

[AR 25]  The ALJ provided a narrative setting forth the evidence considered in determining the RFC and explaining the ALJ's consideration of the medical opinions in the record. [AR 25-33]

At step four, the ALJ found that Plaintiff was able to perform her past relevant work as a cashier II.[7]  [AR 33]  Alternatively, at step five, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed, including the jobs of merchandise marker and domestic laundry worker.  [AR 33-34]  Based on this, the ALJ determined that Plaintiff was "not disabled" from January 1, 2018, the alleged onset date, through November 17, 2023, the date of the ALJ's opinion.  [AR 34-35]

## III.   Analysis

Plaintiff raises two issues on appeal.  First, Plaintiff argues that the ALJ erred in assessing the persuasiveness of Dr. Severance's consultative opinion.  [#11 at 8-11] Second, Plaintiff argues that the ALJ failed to adequately evaluate Plaintiff's migraine headaches.  [*Id.* at 12-18]  Because the Court agrees that the ALJ failed to properly explain her rejection of Dr. Severance's opinion, the Court does not address Plaintiff's alternative argument.

---

[7] At step four, a claimant will be determined to be "not disabled" when it is determined that the claimant retains the RFC to perform either:  (1) the actual functional demands and job duties of a particular past relevant job as performed by the claimant, or (2) the functional demands and job duties of that job as generally required by employers throughout the national economy.  *See* Social Security Ruling 82-61, 1982 WL 31387 (1982); *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1050 (10th Cir. 1993).

In assessing medical opinions for claims filed on or after March 27, 2017, the ALJ "[does] not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, "the ALJ considers the persuasiveness of those opinions using five factors: supportability; consistency; relationship with the claimant; specialization; and other factors, such as 'a medical source's familiarity with the other evidence in a claim.'" *Zhu v. Comm'r, SSA*, No. 20-3180, 2021 WL 2794533, at *5 (10th Cir. July 6, 2021) (quoting 20 C.F.R. §§ 404.1520c(c), 416.920c(c)). "The factors of supportability . . . and consistency . . . are the most important factors" and the ALJ therefore must "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions . . . in [the] determination or decision."[8] 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *see also Zhu*, 2021 WL 2794533, at *6.

"'Supportability' examines how closely connected a medical opinion is to the evidence and the medical source's explanations: 'The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s)[,] . . . the more persuasive the medical opinions . . . will be.'" *Zhu*, 2021 WL 2794533, at *6 (quoting 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1)). "'Consistency,' on the other hand, compares a medical opinion to the evidence: 'The more consistent a medical opinion(s) . . . is with the evidence from other medical sources and

---

[8] "An ALJ must consider, but is not required to explicitly discuss, [the remaining three] factors . . . (relationship with the claimant, specialization, and other factors) unless there are differing medical opinions on an issue and those opinions are equally well-supported and consistent with the record." *Zhu*, 2021 WL 2794533, at *6 n.9 (citing 20 C.F.R. §§ 404.1520c(b)(2), (3), 416.920c(b)(2), (3)).

nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be.'" *Id.* (quoting 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2)). Put another way, the "consistency" factor "is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." *Miles v. Saul*, No. 20-cv-1456-WJM, 2021 WL 3076846, at *3 (D. Colo. Jul. 21, 2021) (quotation omitted).

Here, in assessing Dr. Severance's opinion, the ALJ stated that "Dr. Severance's examination does not support [Dr. Severance's opined] limitations, as there were not significant objective findings noted." [AR 31] The ALJ also stated that the "complete evidence of record, including [Plaintiff's] history of cervical fusion, degenerative changes to the lumbar spine, migraines, and body mass index, is more consistent with greater ability to stand/walk, balance, climb ramps and stairs, crouch, crawl, and kneel, and is further more consistent with environmental limitations." [*Id.*] As a result, the ALJ found Dr. Severance's opinion unpersuasive. [*Id.*]

The ALJ's first reason for discounting Dr. Severance's opinion is legitimate. The Court agrees with the ALJ that Dr. Severance's physical examination was largely unremarkable. [AR 686-89] And while Plaintiff correctly notes that Dr. Severance's physical examination did reveal some limited flexion in the right knee and reduced back extension [#11 at 8-9 (citing AR 687)], the Court's limited review does not require an ALJ to evaluate every minor limitation from every physical examination. In short, the ALJ was free to discount Dr. Severance's opinion because the limitations he propounded were not consistent with his physical examination. *Buttner v. Comm'r of Soc. Sec.*, No. 2:18-cv-32-FtM-UAM, 2019 WL 2724016, at *5 (M.D. Fla. July 1, 2019) (finding that the ALJ did not err in discounting a consultative examiner's opined limitations, in part, because they

were not supported by the examiner's own examination findings); *Barber v. Berryhill*, CIV 16-0280 KBM, 2017 WL 1381356, at *10 (D.N.M. Mar. 23, 2017) (finding the fact that a doctor's opinion which was not consistent with his own evaluation decreased the opinion's supportability); *Oakes v. Colvin*, No. 15-507, 2016 WL 4581347, at *6-7 (W.D. Pa. Sept. 1, 2016) (finding that the ALJ did not err when the ALJ discounted a consultative examiner's opined limitations because those limitations were inconsistent with the examiner's findings in the mental status examination); *Kelly v. Astrue*, No. 2:11-cv-2534-KJN, 2012 WL 5868595, at *6 (E.D. Calif. Nov. 19, 2012) (finding that inconsistency between a consultative examiner's opined limitations and the examiner's own findings would be a valid reason for the ALJ to reject the examiner's opinion, but reversing the ALJ due to other errors in the ALJ's assessment of the examiner's opinion); *see also Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994) (an ALJ may reject a treating physician's opinion when it is inconsistent with the physician's medical records).

The problem, however, is that this inconsistency is not the only reason the ALJ gave for discounting Dr. Severance's opinion.[9]  Rather, as explained above, the ALJ also stated that the "complete evidence of record, including [Plaintiff's] history of cervical

---

[9] Had the ALJ made clear that the inconsistency alone caused the ALJ to reject Dr. Severance's opinion, the Court may have been able to affirm the ALJ's decision.  But, as explained herein, it appears that this inconsistency was just one factor the ALJ relied upon to discount the opinion.  [AR 31 (the ALJ concluding that the "complete evidence of record, including [Plaintiff's] history of cervical fusion, degenerative changes to the lumbar spine, migraines, and body mass index, is more consistent with greater ability to stand/walk, balance, climb ramps and stairs, crouch, crawl, and kneel, and is further more consistent with environmental limitations")]  Thus, it is not clear to the Court whether, based upon the inconsistency alone, the ALJ would have given some weight to Dr. Severance's opinion and adopted some of Dr. Severance's more restrictive limitations.

fusion, degenerative changes to the lumbar spine, migraines, and body mass index, is more consistent with greater ability to stand/walk, balance, climb ramps and stairs, crouch, crawl, and kneel, and is further more consistent with environmental limitations." [AR 31]  But how does Plaintiff's cervical fusion, degenerative changes to the lumbar spine, history of migraines, and obesity support **less** limitations?  If anything, this history would seem to support **greater** limitations.  Indeed, the ALJ relied upon these exact same factors—a history of cervical fusion, degenerative changes to the lumbar spine, migraines, and body mass index—to impose greater limitations than that recommended by Dr. Barber.  [AR 30]  In short, "the Court cannot follow the ALJ's reasoning[;] . . . [i]n other words, the ALJ did not adequately articulate her consideration of [the supportability and consistency factors], as required by the Regulations."  *W.H.D. v. Comm'r*, No. 24-cv-00317-NYW, 2025 WL 902802, at *5 (D. Colo. Mar. 25, 2025).

The Commissioner nonetheless argues that the ALJ's decision must be read as a whole and that the ALJ repeatedly noted normal examination findings.  [#12 at 12]  The Court agrees that an ALJ is not required to continuously repeat earlier analyses.  *See generally Denny v. Kijakazi*, No. CIV-23-111-PRW, 2023 WL 5541570, at *4 (W.D. Okla. July 26, 2023) (collecting cases for the proposition that the ALJ need not repeat analyses from earlier steps at step four).  And the Court further agrees that the ALJ provided an in depth summary of Plaintiff's medical history earlier in the decision.  [AR 26-30]  The problem, however, is that the ALJ's earlier discussion of the medical history simply summarizes that history, without analysis.  [*Id.*]  And without an earlier analysis of the medical records or subsequent explanation for why these medical records do not support Dr. Severance's opinion, the Court is left to speculate as to the basis for the ALJ's

conclusion that the medical records do not support the limitations proffered by Dr. Severance.  And because some of these records do support the limitations proffered by Dr. Severance, and the ALJ does not explain why she nonetheless rejected these greater limitations, reversal is required.[10]  *William M. v. Comm'r*, No. 1:23-cv-01959, 2025 WL 546920, at *6 (D. Or. Feb. 19, 2025) (finding that the ALJ's determination was not supported by substantial evidence when the ALJ simply stated that the medical records did not support a medical opinion but provided no explanation as to why the medical records did not support that opinion); *Galindo v. Berryhill*, No. CV 16–804 CG, 2017 WL 3207914, at *4 (D.N.M. May 3, 2017) (finding that an ALJ "may not reject an opinion as unsupported by the evidence without explaining how the opinion and evidence conflict"); *Valenzuela v. Berryhill*, No. CV 16–522 CG, 2017 WL 3207159, at *4 (D.N.M. May 2, 2017) (holding ALJ's discussion of evidence in considering claimant's credibility was insufficient to reject treating physician's opinion because the court was "left to guess at how exactly [the treating physician's] findings were unsupported by the record").

## IV.    CONCLUSION

Accordingly, for the foregoing reasons, the Court **REVERSES** the Commissioner's decision that Plaintiff was not under a disability within the meaning of the SSA from January 1, 2018 through November 17, 2023 and **REMANDS** this matter to the Commissioner for rehearing and reconsideration consistent with this Order.

---

[10] Once again, the Court is not holding that an ALJ must continuously repeat earlier analyses.  The problem here is that the ALJ's earlier discussion of the medical records merely summarized those medical records, without any analysis.  Thus, it provides no more guidance than simply stating: "The evidence, as outlined by the medical records included in the attached administrative record, does not support the limitations opined by Dr. Severance."  And nobody would argue that such a statement satisfies the ALJ's obligation to consider and analyze a medical opinion.

DATED:  April 24, 2025                    BY THE COURT:


                                          s/Scott T. Varholak
                                          Chief United States Magistrate Judge